IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:18-CV-498-D

SEAN HENRY,  )
 )
          Plaintiff, )
 )
   v. ) **ORDER**
 )
VAUGHN INDUSTRIES, LLC, )
 )
         Defendant. )

On October 22, 2018, Sean Henry ("Henry" or "plaintiff"), an African-American, filed a complaint against Vaughn Industries, LLC ("Vaughn" or "defendant") under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981 [D.E. 1]. Henry alleges that he began working at Vaughn as a safety employee through a temporary staffing firm and that Vaughn racially discriminated against him when Vaughn did not hire him as a full-time Vaughn employee and later terminated his employment as a temporary employee. See id. Henry also alleges that Vaughn retaliated against him for participating in an internal investigation of another employee's misconduct in November 2016. See id. On July 26, 2019, Vaughn moved for summary judgment [D.E. 18] and filed a memorandum and statement of material facts in support [D.E. 19, 20, 21]. On August 16, 2019, Henry responded in opposition [D.E. 24] and filed a statement of material facts [D.E. 22, 23]. On August 30, 2019, Vaughn replied [D.E. 25] and responded to Henry's statement of material facts [D.E. 26]. As explained below, the court grants Vaughn's motion for summary judgment.

I.

Vaughn is an electrical construction contractor based in Carey, Ohio. See Blair Aff. [D.E. 21-1] ¶ 1. Vaughn specializes in "electrical, mechanical (HVAC and Pipefitting), plumbing, high

voltage substation, high voltage transmission and distribution, and renewable energy construction." Blair. Aff., Exs. [D.E. 21-1] 7–8. In 2016, Vaughn began a project in Wilson, North Carolina to build eight solar fields (the "Wilson Project"). See Blair Aff. ¶ 2. In the same year, Vaughn contracted with Aerotek, a staffing firm for temporary workers, to help Vaughn locate temporary "Safety Specialists" to work on the Wilson Project. See id. at ¶ 3. A "Safety Specialist" is "responsible for monitoring compliance with Vaughn's safety policy and ensuring compliance with safety regulations issued by the state and federal enforcement agencies." Id. at ¶ 4; see Livingston Aff. [D.E. 21-2] ¶ 4. Vaughn Safety Specialists must have a valid driver's license to drive to and from job sites. See Livingston Aff. ¶¶ 6, 10.

On September 26, 2016, Henry began working through Aerotek as a temporary Safety Specialist on the Wilson Project. See Livingston Aff. ¶ 5. On the same date, Vaughn assigned Brenda Upchurch ("Upchurch") as a human resources coordinator for the Wilson Project. See Blair Aff. ¶ 10. Upchurch assisted Vaughn with human resources related to Vaughn's temporary workers including to recruit and train temporary employees, to coordinate with temporary-employee agencies, and to act as the temporary employees' "HR point of contact" for the Wilson Project. See id. at ¶ 11.

Before working at Vaughn, Henry worked in a supervisory capacity at another electrical safety job. See Henry Dep. [D.E. 21-3] 6–7. At several points during his employment, Vaughn employees asked Henry to get a valid driver's license so that his employment could continue. See Livingston Aff. ¶ 7; Blair Aff., Exs. at 12–15. Henry, however, did not have a valid driver's license throughout his employment as a temporary employee with Vaughn and repeatedly stated that he was working through a legal process to get his driver's license reinstated. See Blair Aff. ¶ 8; Livingston Aff. ¶¶ 6–8; Henry Dep. at 10. Vaughn's Safety Director, Robert Livingston ("Livingston"),

2

believed that Henry's driver's license would soon be reinstated. See Livingston Aff. ¶ 9. In the interim, Livingston instructed Henry to get rides to the Wilson Project jobsites in Vaughn-provided transportation. See id. This option was available on the Wilson Project "because, as part of the facilitation of the work, and size of the workforce, Vaughn hired buses and vans to transport employees and temporary workers from Vaughn's offices or warehouses to the jobsites and, when necessary, between jobsites" in Wilson. Id.

On November 15, 2016, Vaughn hired Tim Rice ("Rice") as a Quality Control Supervisor for the Wilson Project. See Blair Aff. ¶ 13. On November 16, 2016, a Wilson Project foreman, Scott Dawson, was notified that Rice made homophobic and racist statements when giving instructions to employees. See id. Upchurch gathered statements from ten employees who heard Rice's statements. See id. at ¶ 14. Of the ten employees that provided statements, all were temporary workers, eight were African-American, one was white, and one was an "unknown" race. See id. On November 18, 2019, Vaughn fired Rice for violating Vaughn's equal employment and anti-harassment policies. See id. at ¶ 15. After Rice's firing, Henry alleges that Brian Tschanen ("Tschanen"), Vaughn's Division Manager for solar construction, did not allow Henry to park "up front," "impeded" Henry's work by sometimes not following Henry's advice, and did not give Henry a key to the building in which Henry sometimes worked when Henry's supervisor was on medical leave. Henry Dep. at 24.[1]

In early 2017, Vaughn sought to hire a Safety Coordinator to oversee Vaughn's safety operations throughout the southeastern United States. See Livingston Aff. ¶ 10. The Vaughn Safety Coordinator also would oversee the Wilson Project jobsite, and the position required a valid driver's

---

[1] Tschanen's name is spelled incorrectly as "Shannon" in Henry's deposition transcript. See [D.E. 19] 17 n.5.

3

license. See id. The Vaughn Safety Coordinator would manage the overall safety operation for the remainder of the Wilson Project and also would be responsible for managing the safety projects at other jobsites throughout the southeast after Vaughn completed the Wilson Project. See id.

On February 7, 2017, Henry asked JoAnn Blair ("Blair"), Vaughn's Human Resources Manager, about whether he could join Vaughn as a full-time employee. See Blair Aff. ¶ 17. Blair responded that, in order to be a full-time employee, Henry "needed to get the driver's license issue resolved." Id. Henry also spoke with Livingston. See Livingston Aff. ¶ 12. Livingston told Henry that he was happy with his work, but that he needed to get the driver's license issue resolved due to the Vaughn Safety Coordinator's extensive travel. See id. Livingston also told Henry that Vaughn would prefer someone with an OSHA 500/510 certification. See id.

Vaughn hired Sandy Singles ("Singles"), who is white, as Vaughn Safety Coordinator. See id. Singles possessed a valid driver's license. See Blair Aff. ¶ 16. Henry never reviewed Singles's resume. See Henry Dep. at 18. Upchurch did not make the decision to hire Singles. See Blair Aff. ¶ 12. Tschanen did not make the decision to hire Singles, and did not establish the requirements for the Vaughn Safety Coordinator position. See Livingston Aff. ¶ 17.

In March 2017, Vaughn's work on the Wilson Project was nearing completion. See Livingston Aff. ¶ 13. As a result, Vaughn's president, Matt Plotts, told Livingston that Vaughn needed to reduce the number of safety personnel on site. See id. Henry was the last remaining safety employee assigned through a temporary staffing firm working on the Wilson Project. See id. Thus, on March 17, 2017, Vaughn terminated Henry's temporary employment. See id.; Blair Aff. ¶ 14. Tschanen had no role in the decision to terminate Henry's employment. See Livingston Aff. ¶ 17. Upchurch did not make the decision to terminate Henry's employment. See Blair Aff. ¶ 12.

In his complaint, Henry alleges: (1) failure to hire for the Safety Coordinator position in

4

violation of 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981; (2) termination based on race in violation of 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981; and (3) retaliation in violation 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981. See [D.E. 1] ¶¶ 40–69.

II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference

5

upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

III.

Title VII prohibits an employer from taking adverse employment action against an employee "because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).[2] A plaintiff may establish a Title VII violation in two ways. First, a plaintiff can show through direct evidence that racial discrimination motivated an employer's adverse employment action. See, e.g., Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). If a plaintiff lacks direct evidence (as in this case),[3] a plaintiff can alternatively proceed under the burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973). See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc), abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013).

---

[2] Henry alleges three claims under both Title VII and 42 U.S.C. § 1981 in six numbered claims. See Compl. ¶¶ 40–69. Because the analysis under both statutes is the same, the court analyzes the respective Title VII and section 1981 claims together. See, e.g., Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004); Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 545 n.3 (4th Cir. 2003).

[3] Henry asserts that he has direct evidence of race discrimination. See [D.E. 24] 4. In support, he cites a recording that he secretly made between him and Upchurch. See id.; Henry Dep., Exs. [D.E. 22-1] 69–77. The recording, however, is inadmissable hearsay under Federal Rule of Evidence 801(d)(2)(D) because the record reveals no "independent evidence establishing the existence of the agency" or Upchurch's personal knowledge concerning Vaughn's decision not to hire Henry as Vaughn Safety Coordinator or to terminate Henry's employment. United States v. Portsmouth Paving Corp., 694 F.2d 312, 321 (4th Cir. 1982); see Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co., 951 F.2d 613, 619–20 (4th Cir. 1991) ("Here, we are in agreement with the district court that the relevant question is whether [the hearsay declarants] had authority to hire and fire PPI. If not, statements concerning PPI's contracts with Borg-Warner were made outside the scope of [the declarant's] employment" and are not admissible.); see also E.E.O.C. v. Watergate at Landmark Condo., 24 F.3d 635, 640 (4th Cir. 1994). In fact, the record shows that Upchurch had no authority to hire or fire anyone for Vaughn, including Henry. See Blair Aff. ¶¶ 9–12. Thus, Henry does not have direct evidence of race discrimination.

6

"The McDonnell Douglas framework is comprised of three steps: (1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." Guessous v. Fairview Prop. Investments, LLC, 828 F.3d 208, 216 (4th Cir. 2016). The McDonnell Douglas framework applies to failure to hire, termination, and retaliation claims under Title VII and section 1981. See, e.g., Williams v. Giant Food Inc., 370 F.3d 423, 430 (4th Cir. 2004); Beall v. Abbott Labs, 130 F.3d 614, 619 (4th Cir. 1997), abrogated in part on other grounds by Gilliam v. S.C. Dep't of Juvenile Justice, 474 F.3d 134 (4th Cir. 2007).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the adverse employment action was "for a legitimate, nondiscriminatory reason." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). This burden is one of production, not persuasion. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–11 (1993). If the defendant offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill, 354 F.3d at 285 (quotation omitted); see, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003). A plaintiff can do so by showing that the employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted); see Reeves, 530 U.S. at 147.

In analyzing the record concerning pretext, the court does not sit to decide whether the employer in fact discriminated against the plaintiff on an illegal basis. See, e.g., Holland v. Washington Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279-80 (4th Cir. 2000). Rather, the court focuses on whether the plaintiff has raised a genuine issue of material fact as to pretext under Reeves and its Fourth Circuit progeny. Under Reeves and its Fourth Circuit progeny, a plaintiff may not "simply show the articulated reason is false; he must also show that the employer discriminated against him on the basis of [race]." Laber v. Harvey, 438 F.3d 404, 430-31 (4th Cir. 2006) (en banc). In certain cases, however, the factfinder may infer illegal discrimination from the articulated reason's falsity. See id. at 431; Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000).

A.

To establish a prima facie case of race discrimination for failure to promote or to hire, Henry must show that: "(1) [he] is a member of a protected group, (2) there was a specific position for which [he] applied, (3) [he] was qualified for that position, and (4) [the defendant] rejected [his] application under circumstances that give rise to an inference of discrimination." Williams, 370 F.3d at 430; see McDonnell, 411 U.S. at 802; Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 (4th Cir. 2005).

Vaughn concedes that Henry is a member of a protected class and that Henry expressed interest in the available Vaughn Safety Coordinator position. See [D.E. 19] 9; Blair Aff. ¶ 17; Livingston Aff. ¶¶ 10, 12. In seeking summary judgment, Vaughn argues that Henry was not qualified for the Vaughn Safety Coordinator position because he did not have a valid driver's license, and Henry cannot establish an inference of race discrimination based on the requirement of a valid driver's license because Singles had a valid driver's license when Vaughn hired Singles. See [D.E.

8

19] 9–10; Livingston Aff. ¶¶ 5–12; Blair Aff. ¶¶ 6–8, 16.

An "employer is free to set its own performance standards, provided such standards are not a mask for discrimination." Abbott Labs, 130 F.3d at 619 (quotation omitted); McDougal-Wilson v. Goodyear Tire & Rubber Co., 427 F. Supp. 2d 595, 607 (E.D.N.C. 2006). Moreover, when analyzing an employee's qualifications for a particular job, "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 960–61 (4th Cir. 1996) (quotation omitted); see King, 328 F.3d at 149; Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir.1980).

If an employee demonstrates a prima facie case of race discrimination concerning the failure to hire or promote, the employer may rebut that case "by demonstrating that the person [hired or] promoted was better qualified for the position." Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 189 (4th Cir. 2004); see Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1129–30 (4th Cir. 1995). The employee may then "attempt to prove that the employer's articulated reason for [hiring or] promoting the successful applicant was pretextual." Honor, 383 F.3d at 189; see Amirmokri, 60 F.3d at 1129–30. In analyzing pretext, the "crucial issue" is whether "an unlawfully discriminatory motive for a defendant's conduct [exists], not the wisdom or folly of its business judgment." Jiminez v. Mary Washington Coll., 57 F.3d 369, 383 (4th Cir. 1995).

As for Henry's failure to hire claim, Henry argues that he was more qualified for the Vaughn Safety Coordinator position than Singles because he had more general experience than Singles, he had more experience working on the Wilson Project than Singles, and Singles and Upchurch opined to Henry that Henry was more qualified than Singles for the Vaughn Safety Coordinator position. See [D.E. 24] 7–8. Henry's own opinions of his qualifications, and how those qualifications stand in comparison to Singles, are not relevant. See, e.g., Evans, 80 F.3d at 960; Smith, 618 F.3d at 1067;

9

see also Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988). Assuming without deciding that Singles's and Upchurch's opinions are admissible, Henry has not produced any evidence to show that Singles's and Upchurch's opinions reflect the "perception of the decisionmaker," particularly as it relates to the requirement of a valid driver's license. Evans, 80 F.3d at 960; see Cherry v. Elizabeth State Univ., 147 F. Supp. 3d 414, 421–22 (E.D.N.C. 2015). The "subjective beliefs" of Singles and Upchurch as to Henry's qualifications, "without more, [are] insufficient to create a genuine issue of material fact as to any discriminatory conduct." Bryant v. Bell Atlantic Md., Inc., 288 F.3d 124, 135 (4th Cir. 2002); see Hawkins, 203 F.3d at 280; Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995).

Even viewing the record in a light most favorable to Henry, no rational jury could find that Vaughn believed that Henry was qualified for the Vaughn Safety Coordinator position given that Henry did not have a valid driver's license. As Livingston explained, the Vaughn Safety Coordinator position required the individual to have a valid driver's license. See Livingston Aff. ¶ 10; Blair Aff. ¶ 16. The Vaughn Safety Coordinator would work out of Vaughn's Wilson, North Carolina office and would have to travel throughout the southeastern United States to various Vaughn jobsites. See Livingston Aff. ¶ 10. Unlike Henry's temporary work on the Wilson Project where he could get rides in Vaughn's buses or vans to Wilson Project jobsites, Henry could not get rides in Vaughn's buses or vans throughout the southeastern United States if he were the Vaughn Safety Coordinator. See id. Moreover, the record shows that Singles had a valid driver's license and relevant experience. See Livingston Aff. ¶¶ 10, 12; Blair Aff. ¶ 16. The record also shows that Henry mistakenly believed that he would have performed the Vaughn Safety Coordinator position in Wilson. See Henry Dep. at 17. After the Wilson Project ended, however, the Vaughn Safety Coordinator would have had to travel extensively. See Livingston Aff. ¶ 10. Accordingly, Henry fails to demonstrate

10

a prima facie case of race discrimination concerning Vaughn's failure to hire him as Vaughn Safety Coordinator.

Alternatively, assuming Henry did prove a prima facie showing of race discrimination, Henry fails to demonstrate that Vaughn's reason for hiring Singles instead of Henry as Vaughn Safety Coordinator (i.e., Singles had a valid driver's license, and Henry did not) was pretextual. In opposition, Henry argues that Vaughn does not have "contemporaneous evidence" of a valid driver's license requirement, that Livingston told Henry that he was not hired as Vaughn Safety Coordinator because Henry lacked an OSHA certification, and that Blair's and Livingston's affidavits are designed "to cover for [Vaughn's] discriminatory hiring policies." [D.E. 24] 8.

The court rejects Henry's argument. First, Vaughn need not present "contemporaneous evidence" that the Vaughn Safety Coordinator position required a valid driver's license. See, e.g., Hawkins, 203 F.3d at 279–81; DeJarnette v. Corning, Inc., 133 F.3d 293, 298–99 (4th Cir. 1998). Blair and Livingston attest that Vaughn required a valid driver's license for the Vaughn Safety Coordinator position. See Blair Aff. ¶ 16; Livingston Aff. ¶¶ 6–12. Second, Vaughn (through Blair and Livingston) continually expressed to Henry that Henry's lack of a valid driver's license was a problem for hiring Henry as Vaughn Safety Coordinator, and Henry admits this fact. See, e.g., Blair Aff. ¶ 17; Livingston Aff. ¶¶ 6–12; Blair Aff., Exs. at 11–15; Henry Dep., Exs. [D.E. 22-1] 64–68. In fact, Livingston explained that he told Henry that Henry needed to get his driver's license issue resolved in order to be eligible for the Vaughn Safety Coordinator position and that Livingston also preferred that the Safety Coordinator have OSHA 500/510 certification. See Livingston Aff. ¶ 12.

Next, Henry argues that Vaughn's valid driver's license requirement was not listed in Vaughn's job description for a Safety Coordinator, and that travel was not required. See [D.E. 24] 8–9. Henry also argues that even if travel were required as Vaughn Safety Coordinator, Henry did

11

not have a problem traveling to and from the Wilson Project without a valid driver's license. See id. at 9.

The court rejects Henry's argument. First, the Vaughn Safety Coordinator job description includes a requirement to travel to construction projects in Ohio, North Carolina, Florida, West Virginia, Kentucky, and Indiana. See Livingston Aff., Exs. at 6–7. Livingston testified that Vaughn required that the Vaughn Safety Coordinator have a valid driver's license. See Blair Aff. ¶ 16; Livingston Aff. ¶¶ 6–12. No evidence refutes this requirement. Moreover, unlike the Wilson Project, where Henry could get rides in Vaughn buses or vans, Henry could not get rides in Vaughn buses or vans to job sites throughout the southeast as Vaughn Safety Coordinator. See Livingston Aff. ¶ 10. Vaughn, not this court, gets to decide whether the Vaughn Safety Coordinator position required a valid driver's license. See, e.g., Hawkins, 203 F.3d at 279–81; DeJarnette, 133 F.3d at 298–99. Henry does not dispute that he did not have a valid driver's license. See Henry Dep. at 10.

Henry "may disagree with [Vaughn's] conclusion" concerning the requirement of a valid driver's license, "but the ultimate responsibility for that judgment lies with [Vaughn]." Mereish, 359 F.3d at 339. "Our focus is solely on whether this decision was the result of [illegal] bias." Id. "Duty-bound though we are to examine employment decisions for unlawful discrimination, we are not cloaked with authority to strip employers of their basic business responsibilities." Hux v. City of Newport News, 451 F.3d 311, 315 (4th Cir. 2006).

Even viewing the record in a light most favorable to Henry, Henry has failed to create a genuine issue of material fact that Vaughn's reason for not hiring him as Vaughn Safety Coordinator was pretextual. See Holland, 487 F.3d at 217–18; Hux, 451 F.3d at 317–19; Diamond, 416 F.3d at 319; Anderson, 406 F.3d at 270–73; Honor, 383 F.3d at 189–90; Mereish, 359 F.3d at 336–39; Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649–50 (4th Cir. 2002); Dugan v. Albermarle

12

Cty. Sch. Bd., 293 F.3d 716, 722–23 (4th Cir. 2002); Rowe, 233 F.3d at 830; Hawkins, 203 F.3d at 279–80; Causey v. Balog, 162 F.3d 795, 802–03 (4th Cir. 1998); DeJarnette, 133 F.3d at 298–300; Evans, 80 F.3d at 960–61; Amirmokri, 60 F.3d at 1129–30; Jiminez, 57 F.3d at 383–84; Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987); McDougal-Wilson, 427 F. Supp. 3d at 607–08. Thus, the court grants summary judgment to Vaughn concerning Henry's failure to hire claims under Title VII and section 1981.

B.

To establish a prima facie case concerning his termination claims, Henry must show that (1) he is a member of a protected class, (2) he was discharged, (3) he was fulfilling his employer's legitimate expectations at the time of his discharge, and (4) he was treated differently than a similarly situated employee outside the protected class. See, e.g., Goode v. Cent. Va. Legal Aid Soc'y, Inc., 807 F.3d 619, 626 (4th Cir. 2015); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004); Tahir v. Sessions, No. 5:16-CV-781-D, 2017 WL 1735158, at *4 (E.D.N.C. May 2, 2017) (unpublished), aff'd, 703 F. App'x 211 (4th Cir. 2017) (per curiam) (unpublished).

In seeking summary judgment, Vaughn argues that Henry cannot show that he was treated differently than a similarly situated employee outside the protected class. See [D.E. 19] 14–15. In support, Vaughn notes that Henry was the last temporary safety worker fired from the Wilson Project. See Livingston Aff. ¶ 13. Thus, no similarly situated person outside Henry's protected class was treated more favorably. See [D.E. 19] 14–15.

Henry does not directly address his prima facie case. Instead, Henry contends that the Wilson Project was "a racially charged work environment where people of color were regularly passed over for positions," that Vaughn had a "race discrimination problem" and "general disregard for the well-

13

being of their minority workers," and that Tschanen used derisive and racist language. [D.E. 24] 11.

Even viewing the record in a light most favorable to Henry, the allegedly racially hostile atmosphere does not "bear directly on the contested employment decision" (i.e. Vaughn's decision to terminate Henry's employment). Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995), abrogated on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90, 101–02 (2003); see Rayyan v. Va. Dep't of Transp., 719 F. App'x 198, 202 (4th Cir. 2018) (per curiam) (unpublished); Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608–09 (4th Cir. 1999), abrogated on other grounds by Desert Palace, 539 U.S. at 101–02; see also Dockins v. Benchmark Commc'ns, 176 F.3d 745, 749 (4th Cir. 1999); Birbeck v. Marvel Lighting Corp., 30 F.3d 507, 511–12 (4th Cir. 1994); E.E.O.C. v. Clay Printing Co., 955 F.2d 936, 942 (4th Cir. 1992). As discussed, in mid-March 2017, the Wilson Project was winding down. See Livingston Aff. ¶ 13. Matt Plotts, Vaughn's president, told Livingston that Vaughn needed to reduce the number of safety personnel on site. See id. Henry was the only remaining temporary safety employee assigned through a staffing firm. See id. Thus, Vaughn terminated Henry's employment. See id. Tschanen did not make the decision to terminate Henry's employment. See Livingston Aff. ¶ 17; Blair Aff. ¶ 12. Moreover, Henry does not attribute the comments described in his deposition testimony to Matt Plotts or Robert Livingston, the employees responsible for ending Henry's employment. See Livingston Aff. ¶ 13; cf. Henry Dep. at 23, 25–26, 29. Accordingly, Henry fails to demonstrate a prima facie case that Vaughn terminated his employment because of his race. See, e.g., Rayyan, 719 F. App'x at 202–03; Brinkley, 180 F.3d at 608–09; see also King, 328 F.3d at 149–50.[4]

---

[4] The court does not condone the language that Henry attributes to some Vaughn employees. Henry, however, did not bring a racially hostile work environment claim, and Henry attributes none of the offensive comments to either Plotts or Livingston.

14

Alternatively, even if Henry established a prima facie case, Henry has not created a genuine issue of material fact whether Vaughn's stated reason for terminating his employment (i.e., that Henry was the last safety employee assigned through a temporary staffing firm on the Wilson Project and that the Wilson Project was winding down) was pretext for race discrimination. See Livingston Aff. ¶ 13. In opposition, Henry asserts that Vaughn's stated reason for firing him is pretextual for two reasons. First, Henry argues that but for Vaughn's discriminatory decision not to hire Henry as Vaughn Safety Coordinator, Henry would not have been a temporary employee on March 17, 2017. See [D.E. 24] 15–16. Second, Henry argues that this court should impute the evidence concerning the allegedly racially hostile work environment to Matt Plotts and Robert Livingston. See id.

As for Henry's first argument, it is true that if Vaughn had hired Henry as Vaughn Safety Coordinator, Henry would not have been a temporary employee on March 17, 2017. But the argument ignores Vaughn's reason for terminating Henry's employment. See Livingston Aff. ¶ 13. Moreover, Henry's argument ignores his lack of a valid driver's license and invites the court to speculate on a counterfactual universe without identifying any facts in the record to create that universe. The court declines the invitation. See Matsushita, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)); James v. Booz-Allen Hamilton, Inc., 368 F.3d 371, 377 (4th Cir. 2004). A plaintiff cannot seek to expose a rationale as pretextual "by raising points that are wholly irrelevant to it." Hux, 451 F.3d at 315. Such points are not "material." Id. (quoting Anderson, 477 U.S. at 248).

As for Henry's second argument, it similarly fails to address how Vaughn's stated reason for terminating Henry's employment was pretextual. See Livingston Aff. ¶ 13. Even viewing the evidence in the light most favorable to Henry, Henry has failed to create a genuine issue of material

15

fact concerning whether Vaughn's reason for terminating Henry's employment "is not worthy of belief or that discriminatory reasons more likely motivated the defendant." Warren v. Halstead Indus., Inc., 802 F.2d 746, 752–53 (4th Cir. 1986); see Holland, 487 F.3d at 217–18; Hux, 451 F.3d at 317–19; Diamond, 416 F.3d at 319; Anderson, 406 F.3d at 270–73; Honor, 383 F.3d at 189–90; Mereish, 359 F.3d at 336–39; Thompson, 312 F.3d at 649–50; Rowe, 233 F.3d at 830; Hawkins, 203 F.3d at 279–80; Causey, 162 F.3d at 803–04; DeJarnette, 133 F.3d at 298–300; Evans, 80 F.3d at 960–61; Amirmokri, 60 F.3d at 1129–30; Jiminez, 57 F.3d at 383–84; Felty, 818 F.2d at 1128; McDougal-Wilson, 427 F. Supp. 3d at 607–08. Accordingly, Henry's termination claims fail, and the court grants summary judgment to Vaughn concerning Henry's termination claims under Title VII and section 1981.

C.

To establish a prima facie case of retaliation, Henry must prove that (1) he engaged in protected activity under Title VII, (2) his employer took some action against him that a reasonable employee would find materially adverse, and (3) his employer took the adverse action because of the protected activity. See DeMasters v. Carilion Clinic, 796 F.3d 409, 416 (4th Cir. 2015); Boyer-Liberto v. Fontainbleau Corp., 786 F.3d 264, 281 (4th Cir. 2015) (en banc); Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 410 (4th Cir. 2013); see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67–70 (2006). "Retaliation claims . . . require the employee to show that retaliation was a but-for cause of a challenged adverse employment action." Guessous, 828 F.3d at 217 (quotation and citation omitted); see Huckelba v. Deering, No. 5:16-CV-247-D, 2016 WL 6082032, at *3 (E.D.N.C. Oct. 17, 2016) (unpublished). "Naked allegations of a causal connection between plaintiff's protected activity and the alleged retaliation do not state a plausible Title VII claim." Huckelba, 2016 WL 6082032 at *3. Furthermore, the employee must demonstrate temporal

16

proximity between the alleged retaliation and the protected activity. See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001) (per curiam); Hooven-Lewis v. Caldera, 249 F.3d 259, 278 (4th Cir. 2001); Brown v. Wake Cty. Gov., No. 5:16-CV-806, 2017 WL 2982971, at *4 (E.D.N.C. July 12, 2017) (unpublished); Huckelba, 2016 WL 6082032, at *4.

Vaughn concedes that Henry engaged in protected activity under Title VII and section 1981 when he participated in Vaughn's internal investigation concerning Rice in November 2016, and that terminating Henry's employment on March 17, 2017, was a materially adverse action. See [D.E. 19] 16–19. In seeking summary judgment, Vaughn argues that Henry cannot show a causal link between his November 2016 participation in the investigation and his March 17, 2017 employment termination because Henry did not produce evidence demonstrating that Tschanen had a role in Henry's employment termination, that the four-month gap between the two events is insufficient to show causation, and that Vaughn regularly terminated temporary employees, and Henry was the last to go. See id.

As for Henry's retaliation claim, Henry argues that Tschanen's actions directed at him after Vaughn fired Rice were "materially adverse." See [D.E. 24] 14; Henry Dep. at 24. Specifically, Henry contends that Tschanen did not allow Henry to park "up front," "impeded" Henry's work by sometimes not following his advice, and did not give Henry a key to the building in which Henry worked when Henry's supervisor was on medical leave. Henry Dep. at 24.

Under Title VII and section 1981, material adversity "means [that an employer's actions] well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." White, 548 U.S. at 68. As for materiality, Title VII does not redress "trivial harms" or provide a "general civility code for the American workplace." Id. (quotation omitted); see Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998). Rather, Title VII's anti-retaliation

17

provision prohibits an employer's actions that "are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." White, 548 U.S. at 68 (quotation omitted); see Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997). The court analyzes material adversity from the perspective of an objective, reasonable employee, and ignores "a plaintiff's unusual subjective feelings." White, 548 U.S. at 68–69; see Bryant, 288 F.3d at 134–35. Additionally, the court must account for the "particular circumstances" surrounding the alleged retaliation. White, 548 U.S. at 69.

Even assuming that Henry's allegations concerning Tschanen are true, Tschanen's alleged trivial actions would not dissuade a reasonable worker from complaining about discrimination. See White, 548 U.S. at 68; Holland, 487 F.3d at 219; James, 368 F.3d at 376–77; Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999), abrogated on other grounds by White, 548 U.S. at 59–67; Holley v. N.C. Dep't of Admin., 846 F. Supp. 2d 416, 442–44 (E.D.N.C. 2012). Accordingly, to the extent Henry's retaliation claims rely on Tschanen's trivial actions, they fail.

Alternatively, Henry argues that Vaughn decided to fire him on March 17, 2017, in retaliation for Henry's participation in the November 2016 Rice investigation because "the intervening actions Tschanen took against Henry show retaliatory intent during the longer intervening period." [D.E. 24] 14. In support, Henry cites Lettieri v. Equant Inc., 478 F.3d 640, 650–51 (4th Cir. 2007). See [D.E. 24] 13–14.[5] In Lettieri, the Fourth Circuit held that "where temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening

---

[5] To the extent Henry argues that temporal proximity between the Rice investigation in November 2017 and Henry's firing on March 17, 2017, permits this court to infer that the former caused the later, the court rejects the argument. See Breeden, 532 U.S. at 273–74; King, 328 F.3d at 151 n.5; Winston v. Maryland, No. PWG-17-2477, 2018 WL 5786130, at *10 (D. Md. Nov. 5, 2018) (unpublished).

18

period for other evidence of retaliatory animus," and that evidence "can be sufficient to satisfy the element of causation." Lettieri, 478 F.3d at 650 (quotations omitted).

Lettieri offers Henry no comfort. In Lettieri, plaintiff lodged a complaint with human resources alleging that her direct supervisor engaged in sex discrimination. See id. During the next seven months, the plaintiff's direct supervisor systematically reduced plaintiff's job responsibilities by removing plaintiff's responsibility over a sales team, her authority to set prices, and her ability to directly meet with clients. See id. at 650–51. The supervisor's reduction of plaintiff's "significant job responsibilities" led that same supervisor to assert that the plaintiff and her position within the company were "not needed and should be terminated," only to shortly thereafter hire a male candidate as a replacement in an identical job position to plaintiff's former role. Id.

Even assuming that Henry's allegations concerning Tschanen's conduct are true, and even viewing the record in the light most favorable to Henry, no rational jury could find that Tschanen caused Henry's termination on March 17, 2017. Cf. id.; see Johnson v. Whelling-Pittsburgh Steel Corp., 279 F. App'x 200, 204–05 (4th Cir. 2008) (per curiam) (unpublished); Allen v. Fed. Exp. Corp., No. 1:09CV17, 2011 WL 1260225, at *11 (M.D.N.C. Mar. 31, 2011) (unpublished). As discussed, Tschanen did not terminate Henry's employment. See Livingston Aff. ¶ 17. Plotts and Livingston did. See id. at ¶ 13. Moreover, Henry does not provide any other evidence linking Tschanen's actions and Vaughn's decision to terminate Henry's employment. Cf. Lettieri, 478 F.3d at 650–51.[6] Accordingly, Henry fails to demonstrate a prima facie case of retaliation.

---

[6] In Henry's deposition, Henry speculated that he had heard that Tschanen and Rice were friends. See Henry Dep. at 20. However, even if true, a personal friendship between a person who is not the decisionmaker and a person who got fired "is insufficient to establish unlawful discrimination." Dugan, 293 F.3d at 723.

19

Alternatively, even viewing the record in the light most favorable to Henry, Henry fails to create a genuine issue of material fact concerning whether Vaughn's reason for firing Henry was pretext for retaliation for his participation in the Rice investigation. See Livingston Aff. ¶ 13; Holland, 487 F.3d at 217–18; Hux, 451 F.3d at 317–19; Anderson, 406 F.3d at 270–73; Honor, 383 F.3d at 189–90; Price, 380 F.3d at 215–17; Mereish, 359 F.3d at 336–39; Love-Lane, 355 F.3d at 788–89; Hill, 354 F.3d at 298–99; King, 328 F.3d at 151–54; Thompson, 312 F.3d at 649–50; Rowe, 233 F.3d at 830; Hawkins, 203 F.3d at 279–80; Causey, 162 F.3d at 803–04; Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 444–45 (4th Cir. 1998), overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002); DeJarnette, 133 F.3d at 298–300; Beall, 130 F.3d at 619–20; Evans, 80 F.3d at 960–61; Amirmokri, 60 F.3d at 1129–30; Jiminez, 57 F.3d at 383–84; Felty, 818 F.2d at 1128. Thus, the court grants Vaughn's motion for summary judgment on Henry's retaliation claims under Title VII and section 1981.

IV.

In sum, the court GRANTS defendant's motion for summary judgment [D.E. 18]. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 31 day of March 2020.

JAMES C. DEVER III
United States District Judge